UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
───────────────────────────────
DANIEL FOX,

                Plaintiff,

      -against-

TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY, and Officer RANDOLPH
SANDERS,

                Defendants.
───────────────────────────────

**MEMORANDUM & ORDER**
17-CV-4143 (NGG) (JO)

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Daniel Fox brought this action under 42 U.S.C. § 1983 against Defendants Officer Randolph Sanders and the Triborough Bridge and Tunnel Authority ("TBTA") alleging that Sanders subjected him to excessive force.[1] The case proceeded to trial. At the close of Plaintiff's case, the court denied Defendants' motion to dismiss Plaintiff's municipal liability claim against the TBTA. (*See* Trial Tr. (undocketed) at 630:18-635:25.) On November 15, 2019, following four days of trial, the jury returned a verdict in favor of Plaintiff. (*See* Jury Verdict Sheet (Dkt. 101).) Specifically, the jury found that Plaintiff had proven by a preponderance of the evidence that Sanders subjected Plaintiff to excessive force and that the TBTA's failure to train its officers demonstrated deliberate indifference to potential violations of Plaintiff's constitutional rights. (*Id.*)

Defendants now renew their motion for a directed verdict pursuant to Federal Rule of Civil Procedure 50(b)(3) with respect to

---

[1] Plaintiff initially brought suit against two additional Defendants: Sergeant Laura Tully and Officer Keisha Johnson. (*See* Compl. (Dkt. 1).) However, Plaintiff withdrew his claims against Tully and Johnson during trial. (*See* Trial Tr. at 56:11-18.)

1

Plaintiff's municipal liability claim under *Monell*. (*See* Mot. to Dismiss, Vacate, and/or Set Aside Verdict ("Mot.") (Dkt. 105); Defs. Mem. in Supp. of Mot. ("Mem.") (Dkt. 105).) Defendants also move this court under Rule 50(b)(3) to set aside the verdict (and dismiss the cause of action) against Sanders, arguing that he is entitled to qualified immunity. (*See* Mem. at 14.) Plaintiff opposes Defendants' motion. (*See* Opp. (Dkt. 110).) For the reasons set forth below, Defendants' motion is DENIED.

## I. BACKGROUND

The court assumes familiarity with the background of this case, *see generally Fox v. Triborough Bridge & Tunnel Auth.*, No. 17-CV-4143 (NGG), 2019 WL 5842792 (E.D.N.Y. Nov. 7, 2019),[2] and only briefly reviews the relevant facts. On June 28, 2017, Plaintiff was riding his bicycle with the intention to ride over the Marine Parkway Bridge from Brooklyn to Far Rockaway. (Trial Tr. at 139:3-141:24.) Sanders was on patrol on the Brooklyn side of the bridge, and he directed Plaintiff to dismount and walk over the pedestrian pathway of the bridge—a direction that accorded with the instructions on a sign on the bridge. (*Id.* at 74:17; 519:1-5.) Sanders testified that Plaintiff did not dismount; instead, Plaintiff swore at Sanders and continued to ride his bicycle over the pedestrian pathway to the Far Rockaway side. (*Id.* at 525:6-10.) Sanders testified that, in addition to Plaintiff, there were dozens of people that day who, despite the sign indicating it was prohibited, rode bicycles across the bridge's pedestrian pathway, none of whom were stopped by Sanders. (*Id.* at 480:19-23; 483:21-484:14.) The main difference, from Sanders's perspective, was that Plaintiff was "disrespectful" to him. (*Id.* at 480:24-481:4.)

---

[2] When quoting cases and unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

After Plaintiff did not dismount from his bicycle, Sanders drove his patrol vehicle to the Far Rockaway side of the bridge and stood in the middle of the pedestrian walkway with the intention of stopping Plaintiff and issuing him a summons. (*Id.* at 481:5-11.) Sanders stood in the middle of the walkway as Plaintiff rode his bicycle towards him. (*Id.* at 483:1-9.) At trial, the parties disputed exactly what happened next. Plaintiff testified that as he rode towards Sanders, Sanders did not indicate that Plaintiff should stop riding in any way and, instead, kept his arms crossed. (*Id.* at 151:20-152:10.) Plaintiff testified that he attempted to ride his bicycle around Sanders and that Sanders "body-jacked" or "pushed" Plaintiff "with his arms or something, and [Plaintiff's] whole bike flipped forward." (*Id.* at 151:24-152:3.) Plaintiff testified that, as a result, "my foot was caught in the bike and my face hit the ground, my whole body hit the ground . . . ." (*Id.*) For his part, Sanders testified that he gave Plaintiff a "verbal command" to stop as Plaintiff rode his bicycle towards him. (*Id.* at 508:10-17.) Sanders testified that Plaintiff "tried to get around me, clipped my shoulder and fell of the bike." (*Id.* at 542:3-6.)

After considering the testimony before it—and reviewing a video clip of the incident—the jury determined that Sanders had used excessive force in stopping Plaintiff on the bridge. (Jury Verdict Sheet.) As to Plaintiff's municipal liability claim under *Monell*, the jury found that the TBTA's failure to train its officers demonstrated deliberate indifference to potential violations of Plaintiff's constitutional rights. (*Id.*)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 50 "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have legally sufficient evidentiary basis to find for the party on that issue.'" *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting

Fed. R. Civ. P. 50(a)(1)). "That burden is particularly heavy where . . . the jury has deliberated in the case and actually returned its verdict in favor of the nonmovant." *Id.* "In such circumstances, a court may set aside the verdict only if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Id.* "[I]n entertaining a motion for judgment as a matter of law the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Defendants seek judgment as a matter of law ("JMOL") pursuant to Federal Rule of Civil Procedure 50(b)(3). Rule 50(b)(3) allows a party to move for a "renewed motion for a judgment as a matter of law" if the movant's Rule 50(a) motion was not granted. Fed. R. Civ. P. 50(b). In other words, "because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion," *i.e.*, the party's original motion under Rule 50(a). *See Lore v. City of Syracuse*, 670 F.3d 127, 153 (2d Cir. 2012) (quoting Fed. R. Civ. P. 50 Advisory Committee Note (2006)).

Under Rule 50(a), a party seeking JMOL must satisfy two requirements "to assure the responding party an opportunity to cure any deficiency in that party's proof." *Lore*, 670 F.3d at 152. First the party must move for such judgment "before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). Second, the party's motion "must specify the judgment sought and the law and facts that entitle the movants to the judgment." *Id.* "[T]he specificity requirement is obligatory," *Lore*, 670 F.3d at 152, such

4

that "[a] Rule 50(a) motion requesting [JMOL] on one ground but omitting another is insufficient to preserve a [JMOL] argument based on the later." *Id.* "As to any issue on which proper Rule 50 motions were not made, JMOL may not properly be granted . . . unless that action is required in order to prevent manifest injustice." *Id.* at 153.

### III. DISCUSSION

#### A. Qualified Immunity

Here, Defendants seek JMOL on two issues: (1) the jury's verdict on Plaintiff's *Monell* claim and (2) whether Sanders is entitled to qualified immunity for his use of excessive force. (*See generally* Mem.) However, review of the trial record makes clear that Defendants sought JMOL only on the *Monell* issue and not on the question of qualified immunity before the case was submitted to the jury. Specifically, at the close of the Plaintiff's case, Defendants' sought to dismiss a "number of causes of action" alleged by Plaintiff. (Trial Tr. at 629:12.) These included Plaintiff's failure to intervene and withholding of medical care claim[3] and Plaintiff's *Monell* claim. (*See id.* at 629:17-630:21.)[4] The court then

---

[3] Plaintiff withdrew his failure to intervene claim and withholding of medical care claim. (*See* Trial Tr. at 629:15-630:14.) Plaintiff confirmed that the withholding of medical care claim was "part of the failure to intervene claim." (*See id.* at 630:13.)

[4] After addressing Plaintiff's failure to intervene and withholding of medical care claim, Defendants' counsel stated: "Your Honor, I would also move to dismiss the *Monell* claim. There's no indication that any of the requirements under *Monell* have been met in this case." (Trial Tr. at 630:18-21.) The court asked Plaintiff's counsel if he agreed, to which Plaintiff's counsel responded that he "[d]isagree[d] . . . strongly." (*Id.* at 631:1-3.) The court then asked Defendants' counsel what was next on his list of motions, at which point Defendants' counsel responded "[t]hose are the two claims that I - - well, one has already been discontinued." (*Id.* at 631:7-9.) Defendants' counsel then made his argument to the court as to why Plaintiff's *Monell* claim should be dismissed. (*See id.* at 631:10-633:19.)

heard argument from Defendants' counsel on Defendants' motion to dismiss Plaintiff's *Monell* claim (*see id.* at 631:10-633:19), and the court denied the motion with leave to renew. (*Id.* at 635:23-25.) At the close of Defendants' case, Defendants' renewed their motion to dismiss Plaintiff's *Monell* claim, which the court denied. (*See Id.* at 679:23-680:3; 681:22-23.) Defendants also asked the court to "renew [Defendants'] motion to dismiss the excessive force claim against Officer Sanders," which the court also denied. (*Id.*)

Critically, Defendants did not make a motion for directed verdict on qualified immunity at either the close of Plaintiff's case or the close of their own case. In other words, Defendants did not make a motion for JMOL on the issue of qualified immunity at any time before the case was submitted to the jury. Accordingly, the court cannot grant their motion as to the issue of qualified immunity unless doing so is necessary to prevent manifest injustice.

Defendants only address this issue in a footnote, noting that "[q]ualified immunity was raised as an affirmative defense in [D]efendants' Answer …, in [D]efendants' Trial Memo of Law . . ., in [Defendants'] Proposed Jury Instructions . . . and at the Charge Conference." (Mem at 1 n. 1.) Yet that is plainly insufficient to satisfy the requirements of Rule 50. *See Lore*, 670 F.3d at 152 (Rule 50's "specificity requirement is obligatory."). In fact, before the opening of the case, the court explicitly told Defendants that while Defendants could "raise qualified immunity at any time," they had not yet done so and would need to make a "dispositive motion." (Trial Tr. at 37:11-39-12.) Defendants, however, made no such motion; in fact, the only other discussions about qualified immunity with the court involved proposed jury instructions and the proposed jury charge. (*See id.* at 37:11-13; 70:11-22; 332:11-15.) The court therefore cannot grant their motion now unless doing so is necessary to prevent manifest injustice. *See Alla v. Verkay*, 979 F. Supp. 2d 349, 369 (E.D.N.Y.

6

2013) ("discussing [an issue] with the court . . . during the trial" does not preserve that issue for the purposes of Rule 50."). However, Defendants have not argued that denying them JMOL on qualified immunity grounds would create manifest injustice. The court agrees it would not, and, accordingly, finds they are precluded from seeking JMOL based on qualified immunity. *See Pereyra v. Fancy 57 Cleaners, Inc.*, No. 11-CV-1522 (RJS), 2013 WL 1385205, at *2-4 (E.D.N.Y. Mar. 20, 2013).

### B. *Monell*

Defendants also seek JMOL on Plaintiff's *Monell* claim, arguing that the evidence presented to the jury was insufficient to establish the requirements of municipal liability. (Mem. at 4-13.) This part of Defendants' motion is properly before the court because Defendants moved for JMOL on this issue before the case was presented to the jury. (*See* Trial Tr. at 630:18-25.)

A municipality may be liable under 42 U.S.C. § 1983 for constitutional violations of its employees when such violations result from the municipality's official policy. *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 692-94 (1978). Such a policy may be (1) an express policy; (2) "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988), or (3) a decision by a person with "final policymaking authority," *see Praprotnik*, 485 U.S. at 123; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986).

Here, Plaintiff argued to the jury that the TBTA was liable because it failed to adequately train its employees. A failure to monitor, supervise, or discipline employees can give rise to municipal liability. *See Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). In such a case, "[a] § 1983 plaintiff . . . may establish the pertinent custom or policy by showing that

7

the municipality, alerted to the possible [constitutional violation], exhibited deliberate indifference." *Id.* at 1049. In *Walker v. City of New York*, the Second Circuit held that the following three requirements must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of its citizens:

- That the "policymaker knows to a moral certainty that her employees will confront a given situation";

- That "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and

- That "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."

974 F.2d 293, 297-98 (2d Cir. 1992); *see also Canete v. Metro. Transp. Auth.*, No. 17-CV-3961 (PAE), 2018 WL 4538897, at *5 (S.D.N.Y. Sept. 20, 2018). As explained below, Plaintiff proffered sufficient evidence at trial for the jury to find deliberate indifference with respect to Plaintiff's excessive force claim.

First, Plaintiff elicited testimony from Sanders that one of his main functions as a TBTA officer assigned to the Marine Parkway Bridge was to monitor for bicyclists, make sure bicyclists dismounted when using the pedestrian walkway, and give them a warning or a summons if they did not dismount but instead kept riding. (Trial Tr. at 448:3-20.) In addition, Sanders testified that there were "dozens" of other bicyclists riding across the bridge on the day of the incident with Plaintiff, and that earlier in the day two bicyclists had ignored a command from Sanders's supervisor to stop riding, at which point Sanders was instructed to stop and issue summonses to those riders. (*Id.* at 480:19-23; 526:4-527:11.) Taken together, this testimony was sufficient for the

8

jury to conclude that the TBTA knew to a "moral certainty" that its officers would: (1) confront bicyclists who attempted to continue riding their bicycles on the pedestrian pathway despite signs and verbal warnings from officers not to do so, and (2) be required to effectuate stops of, and issue summonses to, those bicyclists.

Second, in terms of the lack of training, Sanders answered "no" to questioning from the court as to whether his supervisors had ever trained him on how to deal with a situation of trying to stop "a bicycle rider riding downhill . . . by just standing there and telling him to stop." (*Id.* at 456: 20-457:2.) Sanders further testified that the TBTA "did not train me to stand in the walkway and take on a bicyclist." *(Id.* at 460:14.) As to the role any such training would have played in Sanders's handling of the incident with Plaintiff, Sanders *himself* testified that training would have made a difference:

> Q: Now, Officer Sanders, you were faced with a difficult decision that day is your testimony, correct?
>
> A: Difficult as in how?
>
> Q: In how to deal with a bicyclist who is coming down at a high pace on the walkway; correct?
>
> A: Correct.
>
> Q: You were not trained on how to deal with a bicyclist who is coming down at that pace from the bridge; correct**?**
>
> A: That's correct.
>
> Q: Wouldn't you agree that if you were provided specific training on how to deal with this particular situation that would assist you in knowing how to deal with it?
>
> A: Yes.

9

(*Id.* at 496:19-497:8). Later in his testimony, Sanders again reiterated this point:

> Q: If you would have been trained would that have made a difference in this case?
>
> A: It would have helped.
>
> Q: And in what way?
>
> A: I would have made a better decision.

(*Id.* at 510:3-7.) The evidence presented to the jury was therefore sufficient to show that Sanders was faced with a "difficult choice of the sort that training or supervision will make less difficult." *Walker*, 974 F.2d at 297-98; *see also Greenaway v. Cty. of Nassau*, 327 F. Supp. 3d 552, 565 (E.D.N.Y. 2018).

Finally, a jury could reasonably find that "body jack[ing]" or "push[ing]" (Trial Tr. at 151:24-152:3), a citizen off his moving bicycle such that he falls off his bicycle can, depending on the surrounding circumstances, constitute the use of excessive force and therefore cause the deprivation of a citizen's constitutional rights.

Defendants' arguments to the contrary are unavailing. First, Defendants argue that the altercation between Sanders and Plaintiff was an "isolated act" and therefore is "not sufficient to demonstrate a municipal custom, policy or usage that would justify municipal liability." (Mem. at 6 (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).) As the court has previously noted, however, the fact that "a pattern of similar constitutional violations by untrained employees is *ordinarily* required [to justify municipal liability]," *see Connick v. Thompson*, 563 U.S. 51, 61 (2011), does not mean it is *always* required. Here, the jury heard compelling evidence that the TBTA specifically designated officers like Sanders to patrol the bridge for bicyclists impermissibly riding across the bridge and to give summonses to those

bicyclists. (Trial Tr. at 447:24-448:20.) At the same time, Sanders himself testified that (1) the TBTA did not provide him with any training specific for that assignment and (2) specific training would have made it easier for him to safely discharge his duties. (*Id.* at 496:19-497:8.) It was therefore reasonable for the jury to determine that the need for training to prevent constitutional deprivations of the sort suffered by Plaintiff was "obvious." *See Vann*, 72 F.3d at 1049.

Second, Defendants argue that Plaintiff failed to prove the necessary "affirmative link" between the TBTA's failure to train and Sanders's conduct as required under *Monell*. (Mem. at 7 (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).) That is not consistent with the evidence presented to the jury—again, by Sanders himself—that training on how to effectuate bicycle stops would have "assisted" him when he was faced with the "difficult decision" of how to effectuate a stop of Plaintiff, and that such "specific training" would have led to a "better decision." (Trial Tr. at 496:19-497:8; 510:3-7.) Defendants' reliance on *Crews v. Cty of Nassau*, 149 F. Supp.3d 287 (E.D.N.Y. 2015) is inapposite. There, the court rejected the plaintiff's Rule 59 motion after a jury found in favor of the defendant municipality on the plaintiff's *Monell* claim alleging that the municipality failed to adequately train or supervise its personnel on the handling of exculpatory evidence. *Id*. at 294. In particular, the court found that plaintiff had not established that his constitutional injury was caused by the defendant's failure to train, noting that one of the defendant officers "testified under questioning by each of the parties that, regardless of any training he did or did not receive from the [municipality] on the handling of exculpatory evidence, he fully understood his obligations to disclose exculpatory evidence." *Id*. at 296. That testimony stands in stark contrast to Sanders's testimony in this case that specific training regarding the situation he faced with Plaintiff would have "assisted" and "benefited" him and led to a "better decision." (Trial Tr. at

11

496:19-497:8; 510:3-7.) Whereas it was reasonable for the jury in *Crews* to conclude, based in part on the officer's testimony, that any lack of training on the part of the defendant municipality was not "directly injurious" to plaintiff, *Crews*, 149 F. Supp. 3d at 296, here it was reasonable for the jury, based in part on Sanders's testimony, to conclude the opposite.

Based on the foregoing, the court concludes that Defendants have not met their "heavy burden" to demonstrate that there was no "legally sufficient evidentiary basis" for the jury's verdict on Plaintiff's *Monell* claim. *Cash*, 654 F.3d at 333 (2d Cir. 2011).

### IV. CONCLUSION

For the foregoing reasons, Defendants' (Dkt. 105) motion is DENIED. The Clerk of Court is respectfully DIRECTED to enter judgment in favor of Plaintiff in accordance with the jury's verdict.

SO ORDERED.

Dated:   Brooklyn, New York
         May 22, 2020

                                         /s/ Nicholas G. Garaufis
                                         NICHOLAS G. GARAUFIS
                                         United States District Judge